OPINION OF THE COURT
Michael Curci, J.
The defendant has made a motion pursuant to CPL 440.10 (1) (b), (f) and (h) for an order vacating the judgment of conviction on the grounds that the judgment was obtained in violation of his "constitutional rights, ineffective counsel, and the *203 judgment was procured by trickery, deceit and prejudical [sic] conduct on the part of my assigned attorney”.
After due deliberation and consideration of all papers submitted in support and in opposition to this motion and upon the hearing held on August 31, 1995, the defendant’s motion for an order vacating the judgment of conviction is denied.
On June 14, 1994 this defendant was found guilty after trial of one count of robbery in the first degree; one count of grand larceny in the fourth degree; one count of criminal possession of stolen property in the fifth degree; and one count of criminal possession of a weapon in the fourth degree. On July 6, 1994, defendant was sentenced as a second felony offender, to an aggregate term of imprisonment of 121/2 to 25 years.
At trial it was sufficiently and credibly proven that on January 30, 1994, the defendant threatened Sonny Miller with a razor and forcibly stole property from him.
In his motion the defendant specifically alleges the following:
(1) He was denied his right to effective assistance of counsel because his assigned attorney did not "secure” his right to testify before the Grand Jury.
(2) He was denied effective assistance of counsel because his attorney did not call a witness who would have allegedly provided exculpatory testimony.
(3) He was also denied effective assistance of counsel because his attorney did not call him (the defendant) to testify at trial.
(4) "The judgment was procured by trickery, deceit, and prejudical [sic] conduct on the part of my court assigned attorney not appearing in the trial record.”
In support of the defendant’s first allegation that he was denied effective assistance of counsel because the defendant did not testify before the Grand Jury, the defendant, in his affidavit in support of his motion, dated March 25, 1995, stated the following fact allegations:
(1) "I requested that Mr. [name deleted] arraige [sic] for me to speak before the grand jury. Mr. [name deleted] advised against it. He said my story would never be believed by the grand jury especially in view of my past criminal history. I strongly disagreed. I didn’t believe the jury would believe the complainant Sonny Miller in view of his known history of crack cocaine abuse. And, more important, I was innocence [sic]. Our disagreement turned into a heated argument which quickly got out of control. The argument concluded with me demand *204 ing that Mr. [name deleted] secure my right to testify before the grand jury. Mr. [name deleted] angrily responded by saying, 'You act just like a nigger. You don’t believe your own defense attorney.’ At that point, I screamed at him. I called him a racist for calling me a nigger. I asked him not to ever call me a nigger again. 'Just call me Mr. Dunn, you understand?’ I said. I furthermore told him to make sure he got me before the grand jury to testify. Mr. [name deleted] said, 'So you’re a tough guy, huh. Okay, I’ll take care of it.’ Mr. [name deleted] got up and walked out. Before leaving the room, he turned and gave me a parting shot, 'Be careful Mr. Dunn, turn your attorney against you and he can hurt your defense in many ways.’ ”
(3) "I had a statutory right to testify before the grand jury (see CPL 190.50 (5) (A).) According to my sworn facts in paragraph 6 herein, I repeatedly asked my court assigned attorney * * * to secure my right to testify. I told Mr. [name deleted] my story and stressed my innocence. It was imperative for the jury to be told about my long term relationship with the complianant [sic], Sonny Miller, his crack cocaine habit, and my innocence. It is my belief the grand jury would have not indicted me after hearing my testimony. Although Mr. [name deleted] disagreed, I prevailed on him. I was left to believe that I would be testifying before the grand jury. However, I was never given the opportunity to testify before the grand jury. Indeed, I never met with my attorney * * * again until after I was indicted. Furthermore, no motion pursuant to CPL 190.50 (5) (C) to dismiss the indictment for failing to provide notice of grand jury presentment was ever made by Mr. [name deleted] and I have no knowledge of what happen.”
"Factual issues exit [sic] in my case as to whether my attorney * * * recieved [sic] notice of the scheduled grand jury presentment, informed the people of my desire to testify, and/or signed a waiver without my knowledge. The record is completely barren with respect to why no motion was made to dismiss the indictment by my attorney when he learned I did not testify before the grand jury.”
In opposition to this motion the following was credibly stated in response to the defendant’s allegation that he was denied effective assistance of counsel because the defendant did not testify before the Grand Jury.
(1) The Assistant District Attorney (ADA) affirmed that on January 31, 1994, "the defendant was arraigned in criminal court. On that date his attorney * * * did not file notice to testify at the grand jury.”
*205 (2) The defendant’s assigned counsel in an affirmation dated June 7, 1995, affirmed under penalties of perjury that: "Defendant has asserted that I failed to secure his right to testify before the grand jury. However, at the defendant’s criminal court arraignment, I gave him a detailed explanation of the grand jury process and together we weighted [sic] the pros and cons of him testifying. After this discussion between attorney and client, the defendant stated he did not wish to testify before the grand jury.”
In support of the defendant’s allegation that he was denied effective assistance of counsel because his attorney did not call the defendant or another witness to testify at trial the defendant stated the following in his written affidavit: (l)"During trial, on or about May 1994, I asked Mr. [name deleted] to call as a witness the next door neighbor of Sonny Miller, the complaiant [sic]. This was the person who was with Sonny Miller when he gave me his coat to sell. He had first hand knowledge that I never robbed Sonny Miller. This witness came to court during trial prepared to testify on my behalf. His testimony was exculpatory since it would show my innocence. Mr. [name deleted] went out into the hall to talk with the witness. He came back into the courtroom and said, 'Listen boy. We are not going to use that witness. We don’t need him messing up.’ I demanded the witness be called to testify on my behalf and Mr. [name deleted] argued against it. Mr. [name deleted] prevailed against my request by simply refusing to call the witness and sending him home. Subsequently, the witness with exculpatory testimony never took the stand on my behalf. I was left with absolutely no defense. It was my belief that the jury needed to hear my side of the story with respect to what happen [sic]. And, I believed it was imperative for them to hear me proclaim my innocense [sic]. Again, Mr. [name deleted] refused to allow me to testify imspite [sic] of angry and loud disagreement with him. In the end, the jury never heard my story.”
The defendant further stated in his affidavit the following:
"A witness with exculpatory testimony was interviewed by my attorney [name deleted]. The witness was present at 177 Sands when Sonny Miller, the complianant [sic] was allegedly robbed by me on Jan. 30, 1994. The witness was credible and reliable. He told Mr. [name deleted] and me that Sonny Miller was never robbed. The witness further stated that Sonny Miller had lied to police about being robbed because he was paranoid from smoking crack cocaine. Sonny Miller thought I had run *206 off with his coat. Moreover, the witness came to court during the trial for the express [sic] purpose of testifying. Mr. [name deleted] was ineffective by failing to put the witness on the stand especially in view of the material and substantial exculpatory information he had as a result of his direct eyewitness [sic] of the incident on Jan. 30, 1994 (see sworn facts, para. 9 herein).
"As was noted, I told Mr. [name deleted] I was innocence [sic]. And, gave him the same story contained herein. Logically, my defense should have been based on factual innocence, to wit; that a robbery never occured [sic]. Apparently, Mr. [name deleted] was pursuing no defense strategy other than one consistent with the prosecutor’s objective of finding me guilty. Based on the federal court’s 'reasonable professional competence standard’, Mr. [name deleted] defense was inadequate and ineffective (see U.S. v. Man[i]ego, 710 F2d 24). Without question, there is more that [sic] a reasonable probability that results of the trial would have been different but for counsel not putting the witness on the stand (see Wise v. Smith, 735 F2d 735).
"Secondly, the witness’s testimony would have shown the jury how unbelievable it was that I allegedly robbed the complianant [sic] of a old 'coat’. Indeed, the witness would have revealed the complianant’s [sic] motive for alleging he was robbed, i.e., that he was paranoid from smoking crack cocaine and thought I had run off with his coat. Without question, the witness’ testimony would have been more credible since he was a student in school with no past criminal history whereas the complainant had a history of asking neighbors for money to support his crack cocaine habit. The witness, as a next door neighbor of the complianant [sic], was in a unique position to know all about the complianant’s [sic] crack cocaine habit and past conduct. Consequently, the witness’ testimony would have at least created enough reasonable doubt that the jury would not have been able to find me quilty [sic] of robbery. Thus, Mr. [name deleted] defense must be considered ineffective and it can not be viewed as a tactical decision under the circumstances. Accordingly, my constitutional rights to effective counsel under the sixth amendment were violated.
"Finally, it is my belief that Mr. [name deleted] should have called me as a witness especially in light of his failure to call a witness with an [sic] exculpatory testimony. The question as to whether the complianant [sic] was robbed or not was critical. The entire case revolved around the question of who’s [sic] *207 story the jury would believe, the complianant [sic] or mine. Credibility would be the deciding factor. My past criminal history would not have completely damaged my credibility since the complianant [sic] had a past history which could negatively affect his credibility too. Credibility is a issue for the trier of fact to decide. Therefore, the jury needed to be presented with both stories, the complianant [sic] and mine, inorder [sic] to come to a fair verdict. Mr. [name deleted] decision not to put me on the stand can not be seen as a tactical decision under those circumstances by any stretch of the imagination. Indeed, it amounted to sabotage [sic] of my defense”.
The People in its response to these allegations submitted the following: (1) "Defense attorney affirmed under penalties of perjury that:
"1. Defendant has asserted that I failed to call a witness to testify on his behalf. I spoke with this alleged defense witness during defendant’s trial. After speaking with this individual, I did not call him as a witness because: 1) he showed up in court dressed in old filthy clothing and had not showered in weeks; 2) when asked about his prior criminal record, he lied; 3) he did not remember who Sonny Miller, the complainant, was; and 4) the witness did not have any independent recollection of January 30, 1994, the date in question, even thought [sic] it was Super Bowl Sunday. I discussed the above-mentioned issue with the defendant and he decided that his witness should not testify.
"2. Defendant has asserted that he should have testified at trial in his own defense. However, after the people rested on June 13, 1994, I had an extensive discussion with my client on whether he should testify. We spoke about the case presented by the people and my cross-examination of their witnesses. In the end, the defendant felt that there was reasonable doubt and that the presumption of innocence would carry the day. I agreed and did not call him. Furthermore, since I had begun to represent the defendant, his version as to the events of January 30th were inconsistent with each passing court date.”
In support of the defendant’s allegation that the judgment was procured by "trickery, deceit, and prejudical [sic] conduct” on the part of his attorney the defendant stated the following:
"1. Mr. [name deleted] told me early on that an attorney '* * * can hurt your defense in many ways * * *’ In my sworn facts in paragraph 7 and 8, I show how Mr. [name deleted] used the technique of addressing me as 'boy’ in a racially discriminatory manner as a trigger to elicit negative respon *208 se(s) from. me. It was a clever 'trick’ designed, to make me angry in open court. My angry outburst(s) had the desired effect of 'decieving [sic]’ the court and jury into believing I was hostile and violent and thus, likely to be guilty of the violent crime of arm [sic] robbery, without question, my hostile attitude unfairly prejudiced me in front of the jury and unfairly prejudiced this court treatment of me with respect to specific relief I requested, e.g., reassignment of counsel.
"Later in my case, Mr. [name deleted] 'trickery’ was compounded by his deliberate decision to proceed to trial with no defense strategy. This kind of conduct is against every proffessional [sic] code of ethics enuciated [sic] by the American Bar Association and the New York Bar Association. Indeed, it crosses the line between ineffective counsel and malpractice. Subsequently, I repeatedly informed the court that Mr. [name deleted] was racist and informed this court that I had filed a compliant [sic] against Mr. [name deleted] with the New York Bar Association. Under these extrodinary [sic] circumstances, this trial court should have investigated the serious compliants [sic] against assigned counsel (see People v. Gensicki, 510 NYS2d 750). However, this court never investigated my claims that Mr. [name deleted] was racist or gave me a fair chance to explain what was happening off the trial record.
"Mr. [name deleted] discriminatory treatment of me based on race violated my constitutional rights under the due process and equal protection clause of the fourtheen [sic] amendment of the constitution as well as my sixth amendment right to the effective assistance of legal counsel. Indeed, it is my contention that Mr. [name deleted] conduct not only doom [sic] my defense to failure, it was sabbotage [sic] which made my trial a 'farce’ and 'mockery’. (People v. Baldi, [4]44 NYS2d 893) This case represents the first time a defense counsel’s off the record trickery has been exposed and alleged to have produced an adverse judgment. Thus, there isn’t any precedents I can cite where similar conduct is shown to have occured [sic] off the record. Nonetheless, it is clear that a judgment based upon trickery and deciet [sic] may be corrected by a motion to vacate jdgement [sic]. For example, please see People v. Pic[ci]otti, 4 NY2d 340, 175 NYS2d 32, 151 NE2d 191. It should be further noted that in Levy v. Lerner, 853 F.Supp. 636 (E.D.N.Y. 1994), the Honorable J. Glasser held in a Federal civil right [sic] case alleging discriminatory treatment based on race at specific times during a State court proceedings [sic] that the State has a 'interest in ensuring that its judicial system does not treat *209 * * * criminal defendant * * * disparately on the basis of race’. See also Burgos v. Koehler, 727 F.Supp 847, 852 (S.D.N.Y. 1990). Therefore, this court is asked to investigate my allegations that Mr. [name deleted] was racist in my defense and that the judgment was procured, in part by his racist conduct.” The People responded to this allegation wherein the defense attorney affirmed that he "had never made such comment and defendant’s assertions are completely without merit.”
In order to further examine the defendant’s many allegations the court ordered a hearing. On August 22, 1995 the defendant appeared in court. The ADA was engaged in trial and requested an adjournment of the hearing to Friday, August 25, 1995. Whereupon the defendant told the Judge among other things that he (the Judge) was a "racist bastard” and said "I’ll get you”. It is somewhat perplexing to this Judge that the court reporter failed to transcribe this invective by the defendant and therefore it is not contained in the transcript. The defendant said these things loudly and in front of numerous court personnel. This is not the first time that this defendant had directed grossly inappropriate language at the court. On June 13, 1994 during his trial the following occurred:
"court officer [name deleted]: I told him that you ordered him out, Judge. He said, something which I am not going to repeat, to the Judge and he refused to come out at that point.
"the court: I think you have to repeat it.
"court officer [name deleted]: I don’t really want to say it on the record, it is expletive.
"the court: You heard that language before and so did the Appellate Division.
"court officer [name deleted]: He said, 'Fuck the Judge, and that was it. He wasn’t coming out.
"the court: That wasn’t the first time he said that here.
"Here is your next step, I am going to give the defense counsel an opportunity to go talk to his client if he wants to. It is an opportunity, it is a window opportunity which he may jump through or jump out of, as you may desire to translate that.”
On August 31, 1995 all parties were in the courtroom for the defendant’s requested hearing on this matter. The defendant (pro se) was in court. The ADA was in court and the defendant’s prior attorney was also in court. At this hearing the following occurred.
"the clerk: This is number one on the calendar. 1312 of '94, Michael Dunn. Are you Michael Dunn, sir?
*210 "the court: Are you Michael Dunn?
"the defendant: Yeah.
"the court: This is an application by the defendant pro-se to vacate a judgment.

"Mr. Dunn, I read your papers. Is there anything you want to say at this hearing? Anything you want to do? Anybody you want to ask questions of?

"Stand up when you (ad)dress [sic] the court.
"(Defendant stands.)
"the defendant: No.
"the court: Let the record reveal he started. He’s raising his voice. He’s barking at me.

"Mr. Dunn, last time you were here, you stated you were going to get me. Do you still persist in that or do you want to apologize ?

"the defendant: You apologize to me, man. I’m sick of you, man. I’m sick of you.
"the court: Go ahead, say whatever you want to say.
"Are you going to apologize for saying you’re going to get me or shall I call up the police department and tell them to watch you for me? Do I need to do that?
"the defendant: Fuck you, man. You’re a racist motherfucker, man. Fuck you, man.
"the court: You don’t want to answer my question?
"the defendant: Fuck you.
"the court: Is that your best answer?
"the defendant: Fuck you.
"the court: I am not goading you. I am looking for a response. If you tell me you won’t go after me * * *
"the defendant: Fuck you.
"the court: If you tell me* * *
"the defendant: Fuck you.
"the court: Carl, I want this reported to the police department.
"the defendant: Racist motherfucker. I’ll see you in hell man.
"the court: Is there anything else you want to say? We have Mr. [name deleted] here.

"Do you want to ask him any questions?

"You want to answer my question?

*211
"Let the record reveal I’m not getting any answer to my question.

"Sir, this is your last opportunity to be heard, whatever you might want to tell me on your hearing here.

"Do you want to say anything before we part?

"Let the record reveal a reasonable interval of time has passed and the defendant doesn’t say anything.

"All right. Then the hearing is closed. That’s all.

"Thank you.

"the defendant: See you in hell, man. Racist motherfucker.
"the court: Let the record reveal I’m demanding a copy of the record. I want a copy sent to the local police station. And I want police protection.
"Anybody want to be heard?
"You want to be heard, Mr. [name deleted]?
"This hearing is not over necessarily. It’s over only to that extent.
"mr. [name deleted]: Your honor, I did submit paper to the court.
"the court: Of course. I’ll read your papers. Mr. [name deleted], you’re entitled to submit any papers you want. Otherwise, I see an affidavit here. I can read it.
"Thank you very much.” (Emphasis supplied.)
What occurred in court on August 31, 1995 speaks for itself. The defendant was given more than ample opportunity to state whatever he wanted at the hearing. He was given ample opportunity to present witnesses to testify at the hearing that he requested. The defendant also was given an opportunity at this hearing to call and question his prior attorney. The defendant’s prior attorney was quietly sitting in the back of the courtroom during the defendant’s hearing. He had expected and was waiting to testify at the hearing. The defendant would not take any of these opportunities offered to him by the court. All he chose to do was to yell unfounded invective at the court. He refused to restate or present anything new as regards the evil and patently untrue things he wrote in reference to his attorney.
On the issue of the defendant choosing not to testify at the Grand Jury, the advice of his attorney, to the defendant, not to testify and the defendant choosing not to testify, on its face, appears very reasonable considering that the defendant has five prior misdemeanor convictions and two prior felony convictions for robbery. The case law also does not support the *212 defendant’s position. It is firmly established that the failure of defense counsel to secure a defendant his right to testify before the Grand Jury is not, in itself, ineffective assistance of counsel. (People v Hamlin, 153 AD2d 644, 646 [2d Dept 1989]; accord, People v Sturgis, 199 AD2d 549 [2d Dept 1993]; People v Bundy, 186 AD2d 357, 358 [1st Dept 1992], Iv denied 81 NY2d 837 [1993]; People v Jones, 171 AD2d 691, 692 [2d Dept 1991].)
In any event it was credibly shown that at the criminal court arraignment the defendant’s attorney gave the defendant "a detailed explanation of the grand jury process” and they both "weighted [sic] the pros and cons of him testifying”. It was also credibly shown that it was the defendant who then decided not to testify at the Grand Jury. Therefore the defendant himself decided not to testify and has a great deal of nerve complaining about it now.
Defendant’s motion to vacate his convictions on the ground that his attorney was ineffective for not calling either a witness, or the defendant, at this trial also lacks merit and is denied. Defendant’s trial attorney credibly stated in his affirmation that after the People rested on June 13, 1994, that he had an "extensive discussion” with the defendant as to whether the defendant should testify, and that the defendant decided that he "felt that there was reasonable doubt.” Defendant’s attorney also credibly affirmed that he spoke to this so-called witness and believed that he would not have been a helpful witness. Please read defense attorney’s affirmation, paragraph number 4, for some of the facts in which defendant’s attorney based that opinion. Defendant’s attorney discussed all this with the defendant and it was credibly shown that it was the defendant who ultimately decided not to testify or have his witness testify at trial. The court would also note that our past experience with this defendant indicates that he is generally not shy about speaking up and complaining about real or imaginary wrongs that he thinks were committed against him. Therefore, if he so strongly wanted to testify and/or have the witness testify, then why did he not complain about this during his trial. It is now about one year after the defendant’s trial. The transcript of June 12, 1995 (the day the People rested) states the following:
"mr. degregorio: At this time the people rest.
"the court: Approach the bench, we will do a little punctuation here.
"(Bench discussion, off the record.)
"the court: All right, folks, you heard the people say 'rest’.
*213 "It is imperative that you do not use that as a psychological indicator to start thinking about the case and formulate any opinion. That would be very human. That is why I am mentioning it. Don’t do that and I know you will not do that especially if I stress not doing that. Is that clear?
"All right, now go back to the jury room and don’t think about the case.
"(Jury is excused.)
"the court: All right, Mr. [name deleted] you want time to talk to that witness, right?
"mr. [name deleted]: Yes.
"the court: You need five or ten minutes? We will have to have the defendant go back because he can’t stay here for five or ten minutes.
"Bring the defendant back in and I will be back here as soon as you want me but within five or ten minutes.
"(Defendant is excused and at this time a ten minute recess is taken.)
"the clerk: Case on trial continued, People vs. Michael Dunn.
"the court: We are in semi-session now.
"mr. [name deleted]: Can I make a record?
"the court: All right, you got me frightened there for a minute.
"mr. [name deleted]: I need the record to be clear. I have been notified for the first time today that there is a witness present by the name of Mr. Barns, a possible witness to this event and I have just spoken with him for the first time. I am speaking with my client now about the advantages and disadvantages to having Mr. Barns testify on my client’s behalf.
"At this point, your Honor, that is the only thing I would like to put on the record.
"the court: Go ahead.
"(Pause in proceedings.)
"mr. [name deleted]: Your Honor, for the record, I spoke to my client * * *
"the court: Could you excuse me, let me just finish what I am doing now. I utilize the time here, I will finish this piece of paper. I will be right with you and I want to finish reading it.
"(Pause in proceeding.)
"the court: I am ready, are you ready?
*214 "mr. [name deleted]: Yes, I am ready.

”For the record, your Honor, Mr. Barns is outside the courtroom and I spoke to him. I turned over pedigree information to the District Attorney’s office.

"I have consulted with my client and my client’s brother about the pros and cons about putting Mr. Barns on the witness stand. I understand it is not ultimately my client’s decision, it is not ultimately my decision whether to put Mr. Barns on the witness stand.

"the court: I don’t know that.
"mr. [name deleted]: Regardless, in this instance my client * * *
"the court: I see what you are saying, slow down. I work cheap enough.
"I see what you are saying but if you have a defendant who knows what he is doing and that is always a serious question, how you can go against his will would be very difficult. The lawyer has to be responsible in a sense but what do you do if a client won’t take your advice.
"Sometime you have to do what the client says if it is a shady tough area. There have been books printed on it so I agree with the tenure of your remark, I don’t know about the full blossom who, or ultimately who has the final say is very, very difficult.
"mr. [name deleted]: Right.
"the court: And that is part of the problem you are having right now.
"mr. [name deleted]: Thankfully that problem does not exist since both of us agree that it would be my, in my client’s best interest not to put Mr. Barns on the witness stand.
"the court: What are we going to do, do you have anything else, is that it?
"mr. [name deleted]: I would just note my client is present now and I also have spoken to him about his absolute right to testify and he does not wish to testify and the defense will rest in. front of jury when they come in.

”1 am prepared to proceed to closing argument, your Honor.

"the court: Bring the jury out.” (Emphasis supplied.)
The defendant’s final ground for vacatur also totally lacks merit and is also denied. This ground appears to be that the defendant’s attorney was ineffective due to the allegation that the attorney was a complete and total racist. The claim is not *215 made out, and is in no way credible. There is not a scintilla of evidence to support these remarks. The claim has not been substantiated by either direct or circumstantial evidence. Defendant’s attorney, during this trial and prior to this trial, has shown himself to me to be of the highest moral character. He was and is a gentleman. The defendant at the hearing on August 31, 1995 did not have the courage to tell his prior attorney to his face the untrue statements of which he accuses him in writing. It is really a shame that good people have to put up with the publishing of such untrue material. I have known the defendant’s attorney for many years. As both a Legal Aid Society attorney and as an attorney in private practice, he had been aggressive and sometimes headstrong, once perhaps even overzealous pertaining to the rights of his client. Never, not once in all this time, did he ever cross the line and disrespect the court. Ultimately he was always a gentleman. Never once have I heard any complaint about his conduct, nor his professional ability, from anyone including but not exclusive of his hundreds of clients, nor from other Judges, nor from nonjudicial personnel. The low pay of the "18B Plan” does aggravate the insults these poor lawyers have to take. It does hurt when one works at slave wages, and has to take insults in the bargain. It is a shame that such a nice young attorney must take this abuse. He is after all a doctor of law, with four years of college, three years of law school, and God only knows how much more time to pass the Bar. He is motivated then to help people, a noble and altruistic drive, manifested by his prior employment for the Legal Aid Society. The worst of the net effect of this problem is that he has no redress, no way of defending himself. We fear by the Hitlerian "big lie theory” that some of the smear may stick.
The insults to the court are not only untrue, but undeserved. There was not a scintilla of anything referencing race during the entire trial. Nothing, not in any direction. Yet out of the blue the defendant calls me names. It is not fair. He demanded that he be off on Fridays as he says he is a recent Moslem convert, and we closed the court, at State expense, upon his request. That was the only possible reference to religion I can deduce from the transcript. Yet he conjures up these names that he calls me. He called me a racist bastard, and said "that he will get me, that he will see me in hell,” etc. So for no good reason at all I too have been abused, not just his court-assigned attorney.
All of this is truly dangerous, and is also corrosive to our system. This type of off-the-wall smear is being institutional *216 ized in such proceedings over and over again. The Legislature should examine cases like this towards some redress, to fashion some reform, some remedy, which leads me into my last point. Although this case was tried before me, I have of late been assigned the "Miscellaneous Motion Calendar”. While assigned to that calendar I had many "CPL 440 motions”. I review every one assiduously of course. None are treated casually. Interestingly I have found several things in common: (1) most are brought "pro-se”, yet; (2) the affirmations are written in legal language, with citations, excerpts from cases and statutes; (3) with much boiler plate, each similar to one another.
Merrill Sanderson, senior attorney for counsel’s office, Department of Correctional Services, New York State, told us that inmates are trained by a staff law librarian as "law library clerks”, acting sometimes like paralegals, giving legal help in cases like ours. They are paid whatever inmates are paid. The chief law librarian’s "coordinators” office is in Albany. The inmates, these "law library clerks”, are of course incarcerated in the various State institutions, doing this work in the tax-supported law libraries. They can help prepare papers, and advise the prisoners on cases like ours.
That’s the end of what Mr. Sanderson said. I go further and circumstantially suspect this is where most of this disinformation begins. Firstly, I have been doing this many years, and one set of papers looks much like the others, they contain "boiler plate” material, which could be easily stored in file cabinets and reproduced quite similarly in case after case. This whether or not there is total application to the facts in succeeding cases.
Secondly, so much of the material repeats basic law school constitutional law, basic cites and old similar cases like "Mapp" and "Huntley, ” etc. Lawyers do not give cites for them. They just call it a "Mapp hearing” or a "Huntley hearing”. Lawyers do not talk this way. Yet seldom do we find an updated or new case cited.
Thirdly, racism is very often thrown in, without a scintilla, or an iota of evidence. This proves the "law library clerk” did not even read the record of the trial, and did not know anything of what happened or did not happen as a matter of fact.
Fourthly, some of these cases refer to the same grounds, using the same unsubstantiated claims such as: (a) defendant not advised to testify at Grand Jury; (b) defendant not advised reference defendant testifying; (c) defense attorney refused a de *217 fendant proffered witness during trial; (d) the attorney called him racial names. (So much of which is often repeated in the same boiler plate repetitious style. In my experience this has never been substantiated and is always untrue and without merit.)
Fifthly, the sophomoric nonsense of spending a half hour on a detailed allocution of sworn guilt by the defendant, discussing the law and the facts at length, and then defendant reversing himself, saying the opposite, denying his guilt to probation later on. Some defendants are advised to tell Probation that he was not guilty so that later the defendant could argue this nonguilt with the Parole Board. We are given to understand that the Parole Board does not always nor do they make a practice of reading the transcript of the plea or the sentence. This scenario has happened to me on dozens of occasions. The defendant having made that point to Probation, reduced to an official report, the defendant will argue and be able to swear to the Parole Board that they always claim that they were not guilty. Nevertheless none of this seems to stop them from being able to reswear to their guilt before me at sentencing, a second time, and then demand that the original low plea bargain sentence be given to them. To make matters more illogical, the Appellate Division has ruled that a court cannot enhance a defendant’s jail sentence because of these types of lies to Probation. The probation report stands as is; a very officious looking document to be read by the Parole Board. Clever, and we have not defeated this ploy. Many Judges suspect this advice emanates from some of the "law library clerks”.
In this regard recently a friend of mine, a former commander under whom I had served in the New York State Guard, confided in me. He having been a high official in the Department of Correction at Rikers Island, where he said he saw some of this. That there are other "advisors”, not Legal Aid Society lawyers, feeding these spurious, false, ideas to the defendants. He said "advisors,” he did not identify them as the "library clerks,” but circumstantially, it is they to whom he was referring. These "advisors” are ultimately paid by the taxpayer. We believe that these "advisors” suggest these theories, cases, cites, etc., without reading the transcript of the trial or the plea. The reading by me of the transcript so often in my experience belies their offered theories totally. Many hard working, decent Legal Aid and "18B” attorneys tell me they do not like this, but are in no position to speak up publicly. There is little to no recourse for these hard working defense *218 counselors. As only one example, see this case, and. see the abuse the poor court-assigned attorney in this case had to have heaped upon him.
Paradoxically as to the tax-paying public, in many cases therefore they are paying for two separate sets of defense legal advisors, on the same case for the above type of ill-conceived activity. Worse, many times each of the two publicly paid legal advisors are ultimately advising against each other! This is not only ludicrous but if both were lawyers it would also be unethical. It is the taxpayer who pays for this fantastic scenario. This is not only a "brief’ of the nonsense we have seen come out of this duplicative area of a legal defense system. To us, it is an "only in America” problem. It could not happen anywhere else but here!
Because of all we have stated, we are mailing copies of this decision to State Senators, and other legislators, the Governor, the City and State Criminal Justice Administrators, etc., for appropriate actions.
The defendant’s motion is denied in all respects.